1  HELANE L. MORRISON (Cal. Bar No. 127752)
   JAMES A. HOWELL (Cal. Bar No. 92721)
2    (howellj@sec.gov)
   ERIN E. SCHNEIDER (Cal. Bar No. 216114)
3    (schneidere@sec.gov)

4  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
5  44 Montgomery Street, Suite 2600
   San Francisco, California  94104
6  Telephone:  (415) 705-2500
   Facsimile:  (415) 705-2501

7

8                 UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11                      **C  06      5600**

12  SECURITIES AND EXCHANGE COMMISSION,      Case No. _____

13                Plaintiff,

                                            COMPLAINT
14        vs.

15  INDIGENOUS GLOBAL DEVELOPMENT            **DEMAND FOR JURY TRIAL**
    CORPORATION and DENI G. LEONARD,
16
                Defendants.
17

18

19       Plaintiff Securities and Exchange Commission ("Commission") alleges:

20                      **SUMMARY OF THE ACTION**

21       1.     Between at least May 2003 and the present, Indigenous Global Development

22  Corporation ("IGDC") and its founder, chairman and chief executive officer, Deni G. Leonard,

23  defrauded investors out of millions of dollars by making materially false and misleading statements

24  regarding IGDC's purported natural gas business, as well as the status of its funding for that business,

25  in press releases, marketing materials, and public filings.

26       2.     IGDC promoted itself as the first public company in the United States majority-owned

27  by Native Americans and continually hyped its strategic initiatives which it claimed would provide a

28  better future for Native American communities; yet, it never earned any revenue and had no

1  significant assets.  Instead, for more than two years, IGDC and Leonard misled investors by

2  mischaracterizing and omitting key provisions of preliminary agreements reached with various

3  indigenous groups in Canada thereby falsely leading investors to believe that IGDC was poised to

4  reap millions from natural gas contracts.  IGDC and Leonard also falsely claimed that IGDC was

5  purchasing $3 million worth of natural gas.  And, they falsely claimed on two separate occasions that

6  IGDC had obtained multimillion dollar investments that would allow it to further develop its natural

7  gas business.

8       3.       None of IGDC's purported agreements to buy and sell natural gas resulted in any

9  revenue to IGDC.  Nor did IGDC receive the claimed multimillion dollar investments.  Instead,

10 Leonard has funded IGDC's operations on the backs of investors by selling stock and issuing

11 promissory notes.

12       4.       The Commission seeks injunctions, disgorgement of ill-gotten gains, and civil money

13 penalties against both defendants.  It also seeks to bar Leonard from participating in any offering of

14 penny stock and from serving as an officer or director of a public company.

15                    **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

16       5.       This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

17 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]

18 and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15

19 U.S.C. §§ 78u(d), 78u(e), and 78aa].

20       6.       Defendants, directly or indirectly, have made use of the means and instrumentalities of

21 interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of

22 business alleged in this complaint.

23       7.       Venue in this district is proper pursuant to Section 22(a) of the Securities Act

24 [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because both IGDC and

25 Leonard reside and transact business in this district and because acts and transactions constituting

26 violations alleged in this complaint, including the offer and sale of securities, occurred within this

27 district.

28

COMPLAINT                              -2-
SEC v. Indigenous Global Development
Corporation, et al., No. C-06-_____

8.     Assignment to the San Francisco Division of this Court is proper because a substantial part of the events or omissions that give rise to claims alleged in this complaint occurred in San Francisco County.

## DEFENDANTS

9.     Defendant IGDC is a Utah corporation with its principal place of business in San Francisco, California.  Its shares are registered with the Commission under Exchange Act Section 12(g) and currently are quoted on the Pink Sheets (a centralized quotation service that collects and publishes quotes for certain securities).  IGDC has failed to file with the Commission its annual report for the year ended June 30, 2005 and its quarterly reports for the quarters ended September 30, 2005, December 31, 2005, and March 31, 2006.  IGDC is no longer operating.

10.    Defendant Deni G. Leonard resides in San Francisco, California and is a member of the Confederated Tribes of the Warm Springs Reservations of Oregon.  Leonard is IGDC's Chairman and Chief Executive Officer and controls its operations.  He holds a Masters degree in public policy from Harvard's John F. Kennedy School of Government.  As of October 24, 2005, Leonard directly owned 2,650,000 shares (or approximately 2.6%) of IGDC.  As of the same date, together with his affiliated companies, Leonard owned approximately 37% of IGDC's issued and outstanding stock.

## OTHER RELEVANT ENTITIES

11.    First Indigenous Depository Company ("FIDC") is a limited liability company established on the Warm Springs Indian Reservation in Oregon.  Leonard owns 98.5% of FIDC and is its Chairman and Chief Executive Officer.  FIDC employs only one consultant and has no sources of revenue or funding other than sales of IGDC stock.  FIDC purportedly agreed, in exchange for 25 million shares of IGDC stock, to remit to IGDC 90% of its future net profits on natural gas sales.  As of October 24, 2005, FIDC owned 20 million shares (or 20%) of IGDC.  Leonard treated IGDC and FIDC interchangeably and commingled funds between the two entities.

12.    Cree Nation Natural Gas Limited Partnership ("Cree Energy") is a limited partnership registered under the laws of the Province of Saskatchewan, Canada, and is managed by Cree Energy Ltd.

# FACTUAL ALLEGATIONS

**A.   Background**

13.     In public filings beginning at least in 2003 and continuing to the present, IGDC repeatedly described its involvement in a wide array of business ventures including a natural gas program, a power plant program, a division dedicated to providing low-cost mortgages and developing prefabricated homes, and a healthcare program working to provide pharmaceuticals to Native American communities.  IGDC's press releases and marketing materials described even more purported businesses:  acquiring luxury property, selling indigenous wine, and providing sophisticated computer products and consulting services.  According to IGDC, all of these projects were highly lucrative.

14.     None of these alleged ventures has resulted in any revenue to IGDC.  It has never built a power plant, brokered a mortgage, built a home, had any computer consulting clients, or distributed pharmaceuticals.  Nor has it sold any natural gas with the exception of a one-time sale of approximately $54,500 (for which it was not paid) in August 2004.  Rather than being actively involved in several lucrative projects, IGDC instead was a company teetering on the brink on extinction.  As of June 30, 2003, IGDC had earned no revenue, had no significant assets, and had an accumulated deficit of over $9 million.  As of March 31, 2005 (the period for which IGDC last filed financial statements with the Commission) IGDC still had earned no revenue, had no significant assets, and its accumulated deficit had increased to over $14 million.  IGDC's independent auditors warned in both 2003 and 2004 that, based on IGDC's lack of revenue, negative working capital, and shareholder's deficit, there was substantial doubt about its ability to continue operating.

15.     One of Leonard's strategies to attract investors for IGDC was to approach large, established companies as well as various indigenous groups, and persuade them to sign letters of intent or memoranda of understanding expressing an interest in potentially working with and/or investing money in IGDC.  IGDC and Leonard then issued press releases, marketing materials, and public filings which misrepresented these letters of intent or memoranda of understanding as completed contracts and investment deals.  Unbeknownst to IGDC's investors, the majority of these letters of intent or memoranda of understanding were terminated, expired, or never pursued.

16.     IGDC was a small company.  It employed approximately 8 people in 2003 and approximately 23 people in 2004.  IGDC currently does not have any employees.

17.     Leonard controlled almost every aspect of IGDC's business.  He was extensively involved in negotiations regarding IGDC's natural gas program.  He signed the majority of agreements on behalf of IGDC and its affiliated companies.  He edited draft press releases and approved the final versions released to the public.  He reviewed draft marketing materials and approved versions released to the public.  He also controlled IGDC's bank accounts.

18.     Leonard signed and caused to be filed with the Commission IGDC's annual report on Form 10-KSB for the year ended June 30, 2004 (filed October 14, 2004) (as well as amendments to that annual report filed on December 7, 2004 and April 20, 2005) and its quarterly report on Form 10-QSB for the quarter ended March 31, 2005 (filed May 27, 2005).  He also signed certifications in connection with each report stating that the reports did not contain any untrue statements of material fact and omitted no material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

**B.     Fraudulent Misrepresentations and Omissions by IGDC and Leonard**

19.     Since at least 2003, IGDC and Leonard have made numerous materially false and misleading statements and omissions in press releases, marketing materials, and SEC filings thereby falsely leading reasonable investors to believe it was poised to reap millions either from natural gas contracts or from outside financiers.

**May 2003 – IGDC and Leonard Falsely Announced a $5 Million Investment**

20.     Sometime in early 2003, an entity called Native America, FLC signed a letter of intent to provide IGDC with $5 million.  Native America, FLC never provided IGDC with any funds.

21.     On May 22, 2003, IGDC issued a press release with the following headline:  "[IGDC] Secures $5 Million Investment;  Native America, FLC Invests in [IGDC's] Vision for Economic Self-Sufficiency in Indian Country."  IGDC published the press release through Business Wire and posted it to its website.  This press release falsely reported that IGDC "today announced an investment of $5,000,000 from Native America, FLC.  This latest injection of capital will enable [IGDC] to

1  maintain its pace as it moves towards the completion of its energy, pharmaceutical and investment

2  development goals with native tribes in the U.S. and Canada."

3       22.    Leonard reviewed and approved the May 22nd press release before it was issued and

4  posted to IGDC's website.  At the time, he knew, or was reckless in not knowing, that IGDC had not

5  in fact received $5 million from Native America, FLC.

6       23.    IGDC's false statements regarding its purported $5 million investment from Native

7  America, FLC were material.  As of September 30, 2002 (the last period for which IGDC had filed

8  financial statements with the Commission), IGDC had a bank overdraft of $1,969 and had incurred a

9  net loss of $145,662 for the last three months.  IGDC stated in its amended quarterly report on Form

10  10-QSB/A for the quarter ended 9/30/2002 that it "had no operating income and [was] dependent

11  upon funds from borrowing and private placements for funding its day to day cash requirements."  It

12  also warned that if it was "not able to acquire financing, there [was] no assurance it [would] continue

13  to operate."  Viewed in the context of IGDC's precarious financial condition and its admitted

14  dependence on outside funding to continue operating, a reasonable investor would have viewed

15  IGDC's announcement of a $5 million injection of capital as significantly altering the total mix of

16  information available.

17  **March 2004 – IGDC and Leonard Misrepresented the Terms of FIDC's Preliminary Agreement with Cree Energy**

18       24.    From 2004 to the present, IGDC made a series of materially false and misleading

19  statements about its natural gas program, falsely leading reasonable investors to believe that IGDC

20  was poised to reap millions from natural gas contracts.

21       25.    Leonard's idea was to have Cree Energy, a Canadian sovereign tribal company,

22  purchase gas from a Canadian First Nation (a group or tribe of indigenous peoples in Canada) and

23  then sell that gas directly to FIDC, a U.S. sovereign tribal company.  Such an arrangement

24  purportedly would allow FIDC to invoke the protections of certain treaties and avoid various taxes

25  that otherwise would be due.  IGDC ultimately would benefit by way of FIDC's alleged agreement to

26  remit to IGDC 90% of its net profits from gas sales.

27

28

COMPLAINT               -6-

1

    26.    Cree Energy did not own any natural gas. It was established solely for the purpose of

2 serving as a conduit through which FIDC purportedly would purchase gas from the Canadian First

3 Nations. It had no employees and no source of funding or assets other than IGDC or FIDC.

4

    27.    Throughout 2004 and 2005, IGDC, FIDC, and Cree Energy negotiated with various

5 Canadian First Nations to obtain a supply of natural gas. Leonard was the point person for IGDC and

6 FIDC and actively participated in the negotiations. Ultimately, the negotiations failed. Although

7 FIDC completed a small sale of natural gas in August 2004 (for which it was not paid), no one ever

8 agreed to sell IGDC or FIDC natural gas on an ongoing basis.

9

    28.    On or about March 2, 2004, FIDC entered into a letter of intent agreement with Cree

10 Energy contemplating that it would act as FIDC's natural gas broker in Canada. According to the

11 terms of the preliminary agreement with Cree Energy, the letter of intent was not legally binding or

12 enforceable, but merely represented the parties' intention to develop their business relationship with

13 regard to the purchase and sale of natural gas. The letter of intent stated specifically that no

14 agreement would be concluded until the parties each had signed formal legal documentation relating

15 to the purchase and sale of natural gas. Leonard was extensively involved in the negotiations with

16 Cree Energy and he signed the letter of intent on behalf of FIDC.

17

    29.    The March 2nd letter of intent did not require Cree Energy to purchase a specific

18 amount of – or even any – natural gas. Instead, it provided merely that FIDC could purchase from

19 Cree Energy all the gas Cree Energy may acquire in the future. Moreover, the March 2nd letter of

20 intent did not require Cree Energy to sell natural gas to FIDC at a specified price. Instead, it stated

21 that FIDC and Cree Energy still would have to negotiate the basis of the price at which FIDC would

22 buy gas from Cree Energy. FIDC was responsible for funding Cree Energy's natural gas purchases

23 from the Canadian First Nations.

24

    30.    On March 3, 2004, IGDC issued a press release with the following headline:

25 "Cree Energy, LP Signs Agreement with [IGDC]." This press release stated that:

26

27

28

> [IGDC] today announced the signing of an agreement with [Cree Energy]
> to buy and sell Canadian First Nations['] natural gas in the United States. .
> . . [IGDC] and Cree Energy[] plan to ship First Nation's [sic] natural gas
> upon signing. This agreement will provide sufficient natural gas to fuel
> IGDC's ten-43 megawatt peaker and 49.5 megawatt baseload plants

scheduled to start this year. The expected revenue from the initial natural gas sales is approximately $32 million per quarter.

IGDC published this press release through Business Wire and posted it to IGDC's website.

31.     Contrary to the statements in the press release, IGDC had no basis to state that it expected revenue from initial natural gas sales of $32 million per quarter. Nor did it have any basis to state that the agreement would provide sufficient natural gas to fuel its alleged power plants. At the time of the press release, none of the three entities – Cree Energy, IGDC, or FIDC – owned any natural gas. Nor had any of them signed agreements with any Canadian First Nations to purchase natural gas. Nor had any Canadian First Nations agreed to sell them natural gas. Further, neither IGDC nor FIDC had funds to purchase $32 million worth of natural gas.

32.     Additionally, as of March 3rd, Cree Energy and FIDC had signed only a non-binding letter of intent – not an agreement – that represented nothing more than the parties' intention to develop a business relationship with regard to the purchase and sales of natural gas. Finally, the letter of intent was entered into between Cree Energy and FIDC – not Cree Energy and IGDC. Accordingly, even if FIDC did have a natural gas contract, IGDC had no basis to expect $32 million worth of *revenue* from that contract – the most it was entitled to was 90% of the *net profits* of FIDC's natural gas sales.

33.     Leonard reviewed and approved the March 3rd press release before it was issued to the public. He specifically instructed IGDC's former Director of Marketing to refer to IGDC rather than FIDC in the press release. At the time, he knew, or was reckless in not knowing, that neither Cree Energy, nor IGDC, nor FIDC had agreements to purchase $32 million worth of natural gas. He knew, or was reckless in not knowing, that neither IGDC nor FIDC had funds to purchase $32 million worth of natural gas. He also knew, or was reckless in not knowing, that the agreement with Cree Energy was entered into by FIDC and not IGDC.

34.     IGDC's false statements in its March 3rd press release were material. As of December 31, 2003 (the period for which IGDC had last filed financial statements), IGDC had $159 in cash and had incurred an almost $1 million loss over the last six months. It told the investing public in its quarterly report on Form 10-QSB for the quarter ended 12/31/2003 that one of its goals was to sign

key partnership agreements to sell Canadian natural gas in the United States. Viewed in the context of IGDC's precarious financial condition and the fact that it appeared IGDC was making progress on its stated goals, a reasonable investor would have viewed IGDC's announcement of an agreement to sell natural gas resulting in initial revenue of $32 million per quarter as significantly altering the total mix of information available.

**October 2004 – IGDC and Leonard Continued to Misrepresent the Terms of FIDC's Agreement with Cree Energy**

35.     On April 26, 2004, FIDC and a Cree Energy affiliate entered into an Acquisition and Financing Agreement regarding the purchase and sale of natural gas in Canada. The April 26th agreement was virtually identical to the March 2nd letter of intent. For example, the April 26th agreement did not require Cree Energy to purchase a specific amount of – or even any – natural gas. Instead, it provided merely that FIDC could purchase from Cree Energy all the gas Cree Energy may acquire in the future. Moreover, the April 26th agreement also did not require Cree Energy to sell the gas to FIDC at a specified price. Instead, it stated that FIDC and Cree Energy still would have to negotiate the basis of the price at which FIDC would buy gas from Cree Energy. And, as with the March 3rd letter of intent, FIDC was responsible for funding Cree Energy's natural gas purchases from the Canadian First Nations. Leonard was extensively involved in the negotiations with the Cree Energy affiliate and signed the agreement on behalf of FIDC.

36.     The April 26th agreement left open several steps to be completed before FIDC could begin purchasing natural gas and selling it into the United States. Cree Energy still had to sign a contract with a Canadian First Nation to purchase natural gas on behalf of FIDC. FIDC and Cree Energy still had to negotiate the price at which FIDC would purchase the gas from Cree Energy. IGDC (or FIDC) still had to gather funds to pay for the natural gas. And, FIDC still had to find consumers in the United States willing to buy the natural gas.

37.     On October 14, 2004, IGDC filed its annual report on Form 10-KSB for the year ended June 30, 2004. There, it described the second phase of its natural gas program which purportedly was slated to begin in October or November 2004. IGDC then falsely stated it had a contract with Cree Energy that "allow[ed] [IGDC] to purchase and sell 92,700,000 MMB[TU]s (90

billion cubic feet) of natural gas into the United States in fiscal year 2004/2005." (An MMBTU is a unit of heat equal to one million British thermal units). IGDC next falsely stated that IGDC "[could] also purchase the natural gas at a significant discount to the U.S. spot market, for the next 25 years." It further falsely stated that because it had a "reliable and discounted rate on natural gas" it was focusing on acquiring gas-fired electric power plants. IGDC never purchased or sold 90 billion cubic feet of natural gas.

38. Contrary to the statements made in IGDC's annual report, FIDC's April 26th agreement with Cree Energy was not a contract to purchase a specific amount of gas – much less 90 billion cubic feet in IGDC's next fiscal year. Rather, it provided only that FIDC could buy the gas that Cree Energy may acquire in the future. At the time IGDC filed its annual report, Cree Energy did not own any gas. Nor had it acquired any gas on behalf of FIDC (save the small acquisition in August 2004). Nor did it have any agreements to purchase any natural gas on behalf of FIDC. Moreover, IGDC did not have a "reliable" or "discounted" rate on natural gas. The April 26th agreement stated that the parties still would have to negotiate the basis of the price at which FIDC would buy the gas from Cree Energy. Because Cree Energy had no agreements to acquire natural gas, no such negotiations had taken place.

39. At the time Leonard signed and certified IGDC's annual report he knew, or was reckless in not knowing, that FIDC's agreement with Cree Energy did not provide for the purchase of 90 billion cubic feet of natural gas. He also knew, or was reckless in not knowing, that FIDC did not have a "reliable" or "discounted" rate on natural gas.

40. IGDC's misstatements about FIDC's agreement with Cree Energy were material. According to the financial statements contained in its annual report, IGDC had $191,370 in cash, no other significant assets, and had incurred a $3.4 million loss for the year. IGDC described its purported ability to purchase 90 billion cubic feet of natural gas in the same section in which it described its entry into the second phase of its natural gas program, from which it hoped to reach revenues of $36 to $108 million. The clear import of these two statements is that IGDC hoped to reach revenues of $36 to $108 million by way of its purchase and sale of 90 billion cubic feet of natural gas under FIDC's agreement with Cree Energy. Viewed in the context of IGDC's continued

precarious financial conduction, a reasonable investor would have viewed IGDC's statement about its ability to purchase 90 billion cubic feet under its agreement with Cree Energy as significantly altering the total mix of information available.

41.   IGDC repeated the false statements about FIDC's agreement with Cree Energy in two subsequent amended annual reports on Form 10-KSB/A (filed December 7, 2004 and April 20, 2005) when it falsely stated that "IGDC's contract with Cree Energy[] . . . allows [IGDC] to purchase and sell 92,700,000 MMB[TU]s (90 billion cubic feet) of natural gas into the United States in fiscal year 2004/2005." At the time Leonard signed and certified these amended annual reports he knew, or was reckless in not knowing, that the agreement between Cree Energy and FIDC did not provide for the purchase of 90 billion cubic feet of gas in IGDC's next fiscal year.

**November 2004 – IGDC and Leonard Falsely Claimed IGDC Was Purchasing Natural Gas**

42.   On November 23, 2004, Magellan Group Investments, LLC ("Magellan") signed an agreement with FIDC to provide it with a $12 million line of credit; the money was to be used to fund purchases of natural gas. Leonard signed the agreement on behalf of FIDC.

43.   On November 19, 2004, before the agreement even was signed, IGDC issued a press release with the following headline: "IGDC Obtains $12 Million Investment to Market Canadian First Nation[s'] Natural Gas to United States." The press release described IGDC's entry into the "second phase" of its natural gas program whereby it would buy and sell Canadian First Nations' natural gas into the United States. The press release falsely stated that IGDC's "current purchase [was] $3 million of natural gas per month." It also falsely repeated that IGDC "[could] purchase a total of 92,700,000 MMB[TU]s (90 billion cubic feet) of natural gas per year . . . under [its] contract with Cree Energy." IGDC published this press release through Business Wire and posted it to its website.

44.   Contrary to the statements in the press release, neither Cree Energy, IGDC, nor FIDC ever purchased $3 million of natural gas per month. Nor did they have any agreements with any Canadian First Nation to purchase $3 million of natural gas per month. Moreover, FIDC's April 26th agreement with Cree Energy was not a contract to purchase a specific amount of gas – much less 90

1   billion cubic feet.  Rather, it provided only that FIDC could buy the gas Cree Energy may acquire in

2   the future.  And, Cree Energy was under no obligation to purchase any gas for FIDC.

3       45.      Leonard reviewed and approved the November 19th press release before it was issued

4   to the public.  He knew, or was reckless in not knowing, that IGDC had not purchased $3 million of

5   natural gas.  Before this press release was issued, Leonard discussed with IGDC's former Director of

6   Marketing whether IGDC should tell the public that it *would* purchase or that it *could* purchase 90

7   billion cubic feet of natural gas under FIDC's agreement with Cree Energy.  Ultimately, Leonard

8   decided to tell the public that IGDC *could* purchase 90 billion cubic feet of natural gas.  At the time

9   Leonard reviewed and approved the November 19th press release, he knew, or was reckless in not

10  knowing, that the agreement between Cree Energy and FIDC did not provide for the purchase of 90

11  billion cubic feet of gas.

12      46.      The false statements made in IGDC's November 19th press release were material.

13  The November 19th press release had a significant impact on the market for IGDC's stock.  IGDC's

14  trading volume increased from a 30-day average of just over 100,000 shares to trading a total of more

15  than 600,000 shares on the day of, and one day following, the press release.  During the same two-

16  day period, the stock price increased approximately 20% (it ranged from a high of $.45 to a high of

17  $.54).  Moreover, although IGDC and Leonard had been promoting IGDC's purported natural gas

18  program over the last few months, this was the first time IGDC had announced that it actually was

19  purchasing significant amounts of natural gas (it previously announced a small purchase and sale in

20  August 2004).  Coupled with the recent claims that FIDC's agreement with Cree Energy allowed it to

21  purchase 90 billion cubic feet of natural gas, a reasonable investor would have viewed IGDC's

22  announcement that it currently was purchasing $3 million of natural gas as significantly altering the

23  total mix of information available.

24  **2004 Through 2005 – IGDC and Leonard Made False Statements about Chevron Energy
    Solutions in Public Filings and a Brochure**

25      47.      In May 2003 IGDC signed a memorandum of understanding ("MOU") with Chevron

26  Energy Solutions ("Chevron") – a subsidiary of the well known energy company – that provided

27  Chevron with the right (but not the obligation) to review IGDC's projects and decide whether it

28

1    wanted to become involved. The MOU expired in November 2003 and Chevron never provided any

2    services of any kind. Leonard signed the MOU on behalf of IGDC.

3         48.    In its annual report on Form 10-KSB (filed October 14, 2004) and its amended annual

4    reports filed on Form 10-KSB/A (filed December 7, 2004 and April 25, 2005) for the year ended June

5    30, 2004, IGDC falsely stated that it "maintained its existing agreements with its valued partners such

6    as . . . Chevron Energy Solutions." In fact, all contact with Chevron had ceased many months earlier

7    and it had not agreed to work on any projects with IGDC. At the time Leonard signed and certified

8    IGDC's annual report as well as the two subsequent amended annual reports he knew, or was reckless

9    in not knowing, that IGDC's MOU with Chevron had expired several months earlier and that

10    Chevron had not agreed to work with IGDC on any projects.

11         49.    IGDC's misrepresentation about its alleged relationship with Chevron was material.

12    It was important because the purported fact that a large, well-established company like Chevron was

13    doing business with IGDC showed IGDC was a creditworthy and legitimate company in the energy

14    industry.

15         50.    In 2005, IGDC and Leonard continued to hype IGDC's purported relationship with

16    Chevron. In March 2005, Leonard provided an investor who later invested $180,000 in IGDC with a

17    brochure titled, "Indigenous Economic Sovereignty." The Indigenous Economic Sovereignty

18    brochure falsely described Chevron as an "energy program partner providing development and

19    operations [and] maintenance support on distributed generation energy projects for Indian Country."

20    Contrary to this statement, Chevron never worked with IGDC on any project and its relationship with

21    IGDC had ceased more than one year earlier.

22         51.    IGDC made additional false statements in its Indigenous Economic Sovereignty

23    brochure. For example, IGDC falsely repeated that Native America, FLC had "[i]nvested $5 million

24    in IGDC's vision for Native American economic freedom." The brochure did not state when IGDC

25    purportedly obtained the $5 million investment. The brochure also falsely repeated that IGDC had a

26    "contract to sell 90 billion [c]ubic [f]eet of First Nations [n]atural [g]as."

27         52.    The Indigenous Economic Sovereignty brochure also falsely described IGDC as a

28    "perfect balance of a low risk, low priced equity investment" and falsely stated that investors could

1  "rest assured that [their] money [would] produce profits and generate excellent returns."  Contrary to

2  the statements made in the brochure, as of March 2005, IGDC had never earned a profit nor had it

3  generated any returns for investors.  Moreover, Leonard himself had considered IGDC a high risk

4  investment since approximately 2001.

5       53.    At the time Leonard provided the investor who later invested $180,000 with this

6  brochure he knew, or was reckless in not knowing, that Native America, FLC had not invested $5

7  million.  He knew, or was reckless in not knowing, that neither IGDC nor FIDC had a contract with

8  Cree Energy to sell 90 billion cubic feet of natural gas.  He knew, or was reckless in not knowing,

9  that IGDC's MOU with Chevron had expired more than one year earlier and that Chevron had not

10  agreed to work with IGDC on any projects.  He knew, or was reckless in not knowing, that IGDC had

11  never produced a profit or generated a return for an investor.  He knew, or was reckless in not

12  knowing, that IGDC was not a low risk investment.

13       54.    IGDC's false statements in its Indigenous Economic Sovereignty brochure were

14  material.  As of September 30, 2004, (the period for which IGDC had last filed financial statements at

15  the time Leonard provided the $180,000 investor with this brochure), IGDC had a $24,410 bank

16  overdraft and had incurred a $776,403 net loss in the prior three months.  It warned in its quarterly

17  report for the quarter ended September 30, 2004 that its "liquidity ha[d] been materially and

18  adversely affected by continuing operating losses" and that it currently had "no revenue from

19  operations and [was] dependent on majority stockholder and private financing to fund its day-to-day

20  cash requirements."

21       55.    Viewed in conjunction with IGDC's precarious financial condition, a reasonable

22  investor would have viewed a $5 million investment as significantly altering the total mix of

23  information available.  Similarly, a reasonable investor would have viewed a contract to sell 90

24  billion cubic feet of natural gas as significantly altering the total mix of information available.

25  IGDC's purported contract to sell 90 billion cubic feet of natural gas was important because it

26  represented a significant revenue source.  IGDC's statement about its alleged relationship with

27  Chevron was important because the purported fact that a large, well-established company like

28

COMPLAINT               -14-
SEC v. Indigenous Global Development
Corporation, et al., No. C-06-_____

Chevron was doing business with IGDC showed IGDC was a creditworthy and legitimate company in the energy industry.

**March 22, 2005 – IGDC and Leonard Misrepresented the Terms of Preliminary Agreements Reached With Two Canadian First Nations**

56.     On March 9, 2005, FIDC signed a letter of intent with a Canadian First Nation to explore a purchase and sale agreement that would be beneficial for both parties.  The letter of intent provided that it was not intended to be legally binding or enforceable and that it merely represented the parties' intention to develop their business relationship.  The letter of intent did not contain a commitment to sell a specific amount of – or even any – natural gas to FIDC.  Nor did the letter of intent specify at what price it would sell gas to FIDC.  Neither IGDC nor FIDC ever purchased gas from this Canadian First Nation.

57.     On March 25, 2005, FIDC signed a contract agreement with another Canadian First Nation that outlined the parties' intent to explore natural gas production that could be sold to FIDC.  The agreement did not contain a commitment to sell a specific amount of – or even any – natural gas to FIDC.  Nor did the agreement specify at what price it would sell gas to FIDC.  Neither IGDC nor FIDC ever purchased gas from this Canadian First Nation.

58.     On March 22, 2005, IGDC issued a press release with the following headline:  "IGDC Signs Agreement to Buy Natural Gas Program Including Development of Natural Gas Fields."  This press release falsely reported that IGDC's affiliated company, FIDC, "signed a memorandum of understanding with three Saskatchewan First Nations to obtain up to 30,000 MMB[TU]'s [sic] a day of natural gas for sale into the U.S. marketplace.  The amount of natural gas will go to approximately 50,000 MMB[TU]'s [sic] a day within the next few months as details to the final contracts are determined. . . .  Of the signed contracts, two First Nation's [sic] have natural gas available for delivery to the U.S. marketplace immediately."  The press release further falsely described how FIDC's natural gas sales revenue was expected to range between $9 million and $15 million annually.  IGDC published this press release through Business Wire and posted it to its website.

59.     Contrary to the statements made in the press release, FIDC signed preliminary agreements with only two Canadian First Nations – not three.  Second, these preliminary agreements

reflected nothing more than the parties' intention to explore whether or not they could reach an agreement regarding future gas sales. The agreements did not commit either of the Canadian First Nations to sell a specific amount of – or even any – gas to FIDC. Nor did they commit either of the Canadian First Nations to sell gas to FIDC at a certain price. At the time of the press release, neither Cree Energy, nor FIDC, nor IGDC had signed contracts to purchase 30,000 MMBTUs a day of natural gas for sales revenue ranging from $9 million to $15 million annually. Moreover, even if they had secured those contracts, neither FIDC nor IGDC had the funds to purchase gas worth $9 million to $15 million.

60.     Leonard reviewed and approved the March 22nd press release before it was issued to the public. At the time, he knew, or was reckless in not knowing, that the agreements contained no commitments to sell any gas to FIDC. Moreover, he knew, or was reckless in not knowing, that neither IGDC nor FIDC had funds to purchase natural gas worth $9 to $15 million.

61.     IGDC's misrepresentations about its alleged agreements with three Canadian First Nations were material. As of September 30, 2004 (the last period for which IGDC had filed financial statements), IGDC had a bank overdraft of $24,410 and had incurred a $776,403 net loss for the prior three months. Viewed in conjunction with IGDC's continued precarious financial condition and against the backdrop of several previous announcements about IGDC's entry into the second phase of its natural gas program, a reasonable investor would have viewed the March 22nd press release as confirmation that IGDC actually was making progress on its natural gas program, thus significantly altering the total mix of information available.

62.     In its quarterly report on Form 10-QSB for the quarter ended March 31, 2005, IGDC falsely repeated that "FIDC signed a memorandum of understanding with three Saskatchewan First Nations to obtain up to 30,000 MMB[TU]'s [sic] a day of natural gas for sale into the U.S. marketplace. The amount of natural gas will go to approximately 50,000 MMB[TU]'s [sic] a day within the next few months as details to the final contracts are determined." At the time he signed and certified IGDC's March 31, 2005 quarterly report Leonard knew, or was reckless in not knowing, that the agreements with the two Canadian First Nations contained no commitments to sell any gas to

FIDC.  Moreover, he knew, or was reckless in not knowing, that neither IGDC nor FIDC had funds to purchase $9 to $15 million of natural gas.

**May 2005 – IGDC and Leonard Misrepresented the Status of FIDC's $12 Million Line of Credit**

63.     In December 2004, Magellan, the investment group referenced in the November 19th press release, advanced approximately $250,000 to Cree Energy for the purpose of reserving pipeline capacity in anticipation of FIDC's future gas purchases.  IGDC and FIDC instead used the money to pay their employees and Leonard.

64.     FIDC failed to pay amounts due under the Magellan line of credit.  In February 2005, Magellan notified Leonard that FIDC had defaulted on the line of credit agreement, demanded immediate repayment of the funds it previously had advanced, and threatened to sue FIDC if the funds were not received by the end of the month.  FIDC never repaid those funds.  On May 16, 2005, Magellan sued FIDC for breach of contract.

65.     Notwithstanding the fact that FIDC had defaulted on the line of credit agreement and been sued for breach of contract, IGDC and Leonard falsely represented that FIDC still had access to a $12 million line of credit.  IGDC stated in its quarterly report filed on Form 10-QSB for the quarter ended March 31, 2005 (filed May 27, 2005) that FIDC had obtained "a line of credit up to $12 million" and that the "line of credit to FIDC [was] designated to purchase and transport Canadian First Nation's [sic] natural gas from Canada to the United States.  This upcoming purchase [would] begin Phase II of IGDC's natural gas program and [was] expected to begin in mid-2005."  Nowhere in its March 31, 2005 quarterly report did IGDC disclose the fact that FIDC had defaulted on the line of credit and was being sued for breach of contract.  Nor did IGDC nor Leonard ever correct the false statements made in IGDC's March 31, 2005 quarterly report.

66.     At the time Leonard signed and certified IGDC's quarterly report on Form 10-QSB for the quarter ended March 31, 2005, he knew, or was reckless in not knowing, that FIDC no longer had access to the $12 million line of credit.  He also knew, or was reckless in not knowing, that FIDC was being sued for breach of contract.

67.     IGDC's misrepresentations regarding FIDC's $12 million line of credit were material. This was the largest source of funding IGDC (or one of its affiliates) had obtained since the purported $5 million investment by Native America, FLC.  Moreover, IGDC stated specifically in its March 31, 2005 quarterly report that it planned to use the $12 million line of credit to fund its upcoming purchase of natural gas which it expected to result in revenue of $9 to $15 million.  This would have been IGDC's first revenue stream.  At the time IGDC filed its March 31, 2005 quarterly report with the Commission, it had no other funds to purchase gas.  It in fact had a $1,077 bank overdraft.  A reasonable investor would have viewed the fact that FIDC no longer had access to its $12 million line of credit and that, accordingly, it no longer could afford to purchase natural gas worth $9 to $15 million, as significantly altering the total mix of information available.

**September 2005 – IGDC and Leonard Falsely Announced a $100 Million Investment**

68.     On September 7, 2005,  China Metallurgy International Group Co. Ltd. ("China Metallurgy") issued a letter of intent to IGDC and Leonard stating that it potentially was interested in purchasing products from IGDC and that it had access to $100 million.  China Metallurgy told Leonard that it would need to complete additional due diligence before it decided to purchase any products.  At no point did China Metallurgy agree to purchase any products from IGDC.  Nor did it ever agree to invest any money in IGDC.

69.     On September 20, 2005, IGDC issued a press release with the following headline: "IGDC Obtains $100 Million Investment for its Energy Programs."  This press release falsely reported the "infusion of an investment package of $100 million by an Asian Investment Energy Group."  China Metallurgy is the "Asian Investment Energy Group" referenced in the press release. IGDC posted the press release to its website on September 20, 2005 and published it through Business Wire on September 21, 2005.

70.     Contrary to the statements made in the press release, IGDC did not obtain $100 million from China Metallurgy.  Moreover, China Metallurgy never agreed to invest $100 million in IGDC.

71.     Leonard reviewed and approved the September 20th press release before it was issued to the public.  One of China Metallurgy's representatives reviewed the press release before it was

issued and told Leonard it was incorrect because IGDC had not obtained $100 million. IGDC issued

the press release anyway. At the time IGDC issued the press release, Leonard knew, or was reckless

in not knowing, that IGDC had not obtained $100 million from China Metallurgy.

72.    IGDC's false statements about its purported $100 million investment were material.

The September 20th press release had a significant impact on the market for IGDC's stock. IGDC's

average daily trading volume for the 30 days before the press release was approximately 117,000

shares. On the day IGDC posted the press release to its website, its trading volume increased to

287,500 shares. The next day's trading volume (the same day on which IGDC published the press

release through Business Wire) increased to 898,200 shares. At least three investors purchased IGDC

stock as a direct result of this false press release. Moreover, as of March 31, 2005 (the last period for

which IGDC filed financial statements), IGDC had a bank overdraft of $1,077 and a net loss for the

preceding nine months of $1.5 million. It stated in its quarterly report on Form 10-QSB for the

quarter ended March 31, 2005 that there was "substantial doubt about [IGDC's] ability to continue as

a going concern" and warned that "[w]ithout realization of additional capital . . . settlement of

delinquent notes payable, or established revenue sources" it would be unlikely for IGDC to continue

operating. In light of IGDC's continued precarious financial condition, as well as its dependence on

outside funding to continue operations, a reasonable investor would have viewed IGDC's

announcement of a $100 million investment as significantly altering the total mix of information

available.

**C.    The Defendants Were Unjustly Enriched**

73.    From at least 2003 through the present, IGDC and Leonard were unjustly enriched by

way of their fraudulent conduct. During this period, IGDC and Leonard raised at least $2.3 million

by selling IGDC securities to investors. Leonard participated in the sale of IGDC securities. He

personally discussed IGDC securities and its projects with investors.

74.    During the same period, IGDC issued over 1 million shares to its employees and

consultants in lieu of cash compensation and issued in private transactions with investors and

creditors an additional 1.3 million shares. Leonard and his affiliated companies (including FIDC)

1   sold in open-market transactions IGDC stock worth at least $238,860 and sold or otherwise

2   transferred in private transactions with investors and creditors an additional 1.5 million shares.

3                              **FIRST CLAIM FOR RELIEF**

4            **Violations of Section 17(a) of the Securities Act Against All Defendants**

5        75.    The Commission realleges and incorporates paragraphs 1 through 74 by reference.

6        76.    Defendants IGDC and Leonard have, by engaging in the conduct set forth above,

7   directly or indirectly, in the offer or sale of securities, by the use of means or instruments of

8   transportation or communication in interstate commerce, or of the mails: (a) with scienter, employed

9   devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue

10  statements of material fact or by omitting to state material facts necessary in order to make the

11  statements made, in the light of the circumstances under which they were made, not misleading; or

12  (c) engaged in transactions, practices, or courses of business which operated or would operate as a

13  fraud or deceit upon the purchasers of such securities.

14       77.    By reason of the foregoing, defendants violated, and unless restrained and enjoined

15  will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

16                             **SECOND CLAIM FOR RELIEF**
                  **Violations of Section 10(b) of the Exchange Act**
17                **and Rule 10b-5 Thereunder Against All Defendants**

18       78.    The Commission realleges and incorporates Paragraphs 1 through 74 by reference.

19       79.    Defendants IGDC and Leonard have, by engaging in the conduct set forth above,

20  directly or indirectly, in connection with the purchase or sale of securities, by use of means or

21  instrumentalities of interstate commerce, or of the mails, or of a facility of a national security

22  exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue

23  statements of material fact or omitted to state material facts necessary in order to make the statements

24  made, in light of the circumstances under which they were made, not misleading; or (c) engaged in

25  acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other

26  persons.

27

28

1    80.    By reason of the foregoing, defendants violated, and unless restrained and enjoined

2    will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

3    C.F.R. § 240.10b-5] thereunder.

4                              **THIRD CLAIM FOR RELIEF**

5    **Violations of Sections 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13
Thereunder Against IGDC**

6    81.    The Commission realleges and incorporates Paragraphs 1 through 74 by reference.

7    82.    Based on the conduct alleged above, IGDC violated Section 13(a) of the Exchange

8    Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1,

9    and 240.13a-13], which obligate issuers of securities registered pursuant to the Exchange Act to file

10   with the Commission annual and quarterly reports that, among other things, do not contain untrue

11   statements of material fact or omit to state material information necessary in order to make the

12   statements made, in light of the circumstances under which they were made, not misleading.

13   83.    By reason of the foregoing, unless restrained and enjoined, IGDC will continue to

14   violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13

15   [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

16                             **FOURTH CLAIM FOR RELIEF**

17   **Aiding and Abetting Violations of Sections 13(a) of the Exchange Act and Rules 12b-20, 13a-1,
13a-13 Thereunder Against Leonard**

18   84.    The Commission realleges and incorporates Paragraphs 1 through 74 by reference.

19   85.    Based on the conduct alleged above, IGDC violated Section 13(a) of the Exchange

20   Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1,

21   and 240.13a-13], which obligate issuers of securities registered pursuant to the Exchange Act to file

22   with the Commission annual and quarterly reports that, among other things, do not contain untrue

23   statements of material fact or omit to state material information necessary in order to make the

24   statements made, in light of the circumstances under which they were made, not misleading.

25   86.    By engaging in the conduct described above, Leonard knowingly provided substantial

26   assistance to IGDC's filing of materially false and misleading reports and filings with the

27   Commission.

28

COMPLAINT                                      -21-
SEC v. Indigenous Global Development
Corporation, et al., No. C-06-_____

87.   By reason of the foregoing, Leonard has aided and abetted IGDC's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

### FIFTH CLAIM FOR RELIEF
### Violations of Rule 13a-14 under the Exchange Act by Leonard

88.   The Commission realleges and incorporates Paragraphs 1 through 74 by reference.

89.   Leonard signed, as IGDC's Chief Executive Officer, false certifications pursuant to Rule 13a-14 of the Exchange Act that were included in IGDC's annual report for its fiscal year ended June 30, 2004, as well as both amendments thereto, and its quarterly report for the quarter ended March 31, 2005.  In each such certification, Leonard falsely stated, among other things, that each report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

90.   By reason of the foregoing, Leonard has violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enjoin each of the defendants from future conduct that violates the provisions of the federal securities laws alleged against them in this complaint.

II.

Order all defendants to disgorge their ill-gotten gains in an amount according to proof, plus prejudgment interest thereon.

III.

Order all defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

IV.

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit defendant Leonard from acting as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or required to file reports pursuant to Section 15 of the Exchange Act (15 U.S.C. § 78o].

V.

Pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], prohibit defendant Leonard from participating in any offering of penny stock.

VI.

Retain jurisdiction of this action in accordance with principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as this Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

The Commission hereby demands a jury trial.

Dated: September 12, 2006

Respectfully submitted:

By: _____
Erin E. Schneider
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

COMPLAINT                                    -23-
SEC v. Indigenous Global Development
Corporation, et al., No. C-06-_____