United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

    v.

INDIGENOUS GLOBAL DEVELOPMENT
CORPORATION, ET AL.,

            Defendants.
_____/

No. C-06-05600 JCS

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANTS DENI G.
LEONARD AND INDIGENOUS GLOBAL
DEVELOPMENT CORPORATION
[Docket No. 61]**

## I.   INTRODUCTION

This action involves alleged violations of securities laws by Defendant Indigenous Global Development Corporation ("IGDC"), a Native American majority owned public corporation, and its Chief Executive Officer ("CEO"), Defendant Deni G. Leonard. Leonard denies these violations and accuses Plaintiff Securities and Exchange Commission ("SEC") of improper conduct, including making racist statements, in the course of this proceeding. More broadly, Leonard asserts that the SEC has a history of violating the rights of American Indian Tribes. Plaintiff has filed a Motion for Summary Judgment Against Defendants Deni G. Leonard and Indigenous Global Development Corporation (the "Motion"). All parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The Court held a hearing on the Motion on Friday, May 30, 2008, at 9:30 a.m. Following the hearing, the parties filed supplemental briefs on the question of monetary penalties. For the reasons stated below, the Motion is GRANTED.[1]

---

[1] All parties have agreed that this case may proceed before a United States magistrate judge through final judgment, pursuant to 28 U.S.C. § 636(c).

1  **II.    BACKGROUND**

2      **A.    Facts**[2]

3          **1.    IGDC's Formation and Mission**

4          In its 10K-SB for the period ending June 30, 2004, filed with the SEC on October 14, 2004,

5  IGDC describes its formation and mission as follows:

6              Indigenous Global Development Corporation (hereinafter, "IGDC" or
               the "Company") is engaged in the business of providing strategy,
7              financial and investment tools to deliver economic development,
               empowerment and financial self-sufficiency for Native Americans
8              across the U.S. and indigenous people worldwide. To reach these
               objectives the Company's focus is on investment financing in Indian
9              Country, sales of Canadian First Nations natural gas in the U.S., work
               to develop and acquire power plant projects and efforts to develop
10             programs to provide lower cost healthcare to Native America
               Communities throughout the U.S.

11

12             [IGDC] began with the incorporation of the United Native Depository
               Corporation ("UNDC") in July 2000 on the Navajo Reservation.
13             UNDC is a financial holding company organized under the laws of the
               jurisdiction of the Navajo Nation.  UNDC is 100 percent owned by
14             Native American members whose objective is to increase the
               economic well-being of Native Americans and indigenous people
15             worldwide.  Mr. Deni Leonard is the Company's Chairman and CEO
               and is the principal and controlling shareholder of UNDC.

16             In February 2001, UNDC entered into negotiations to purchase a
               company named Focal Corporation.  The Focal Corporation shell was
17             acquired in May 2001 and Focal's projects and staff went to a spin off
               company in the same month, which was then named Superior
18             Development, Inc.  In May, 2002, the Focal Corporation name was
               changed to Indigenous Global Development Corporation to reflect the
19             significant change in the Company's character and strategic focus.

20  Declaration of Robert L. Mitchell in Support of Plaintiff's Motion for Summary Judgment Against

21  Defendants Deni G. Leonard and Indigenous Global Development Corporation ("Mitchell Decl."),

22  Ex. A (IGDC 10K-SB Form for year ending June 30, 2004) at 3.  IGDC's shares were registered

23  with the SEC under Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") and

24  were listed for trading on the Bulletin Board of the National Association of Securities Dealers over-

25  the-counter market, the "OTCBB."  *Id*. at 1, 14-15.  Deni Leonard was the IGDC's Chairman, CEO

26  and Chief Financial Officer ("CFO").  *Id*. at 57-58.

27  ─────────────────────

28          [2]  In its summary of the facts, the Court relies on facts that it finds to be undisputed unless
    otherwise noted.

2

*(left margin, vertical text)* **United States District Court** / For the Northern District of California

In its SEC filings, IGDC described itself as a "Development Stage Company."  *Id*. at 18; *see also* Mitchell Decl., Ex. B (Leonard Depo.) at 52-53 (testimony that IGDC's lawyers recommended that this term be used to reflect that IGDC was not a "full-blown ongoing company" but rather, was at a "development stage[]").  For the fiscal years that ended June 2003 and June 2004 and the nine-month period that ended March 31, 2005 – the last period for which IGDC filed financial results with the SEC – IGDC reported no revenues.  *Id*. at 18-19; Mitchell Decl., Ex. D (10Q-SB Form for period ending June 30, 2004) at 32.  Further, in the 10K-SB for the period ending June 30, 2004, IGDC stated that its "liquidity [had] been materially and adversely affected by continuing operating losses."  Mitchell Decl., Ex. A at 13.  The report continued, "[t]he Company has no revenue from operations and is dependent on the majority stockholder and private financing to fund its day-to-day cash requirements."  *Id*.

#### 2.    Statements at Issue in This Case

Between May 2003 and September 2005, IGDC and Leonard made statements in press releases and SEC filings that the SEC asserts constituted securities violations.  The statements, as well as the evidence relating to the underlying transactions and agreements, are described below.

#### a.    May 22 2003 Press Release Relating to Native America FLC Investment

On May 22, 2003, IGDC issued a press release entitled, "Indigenous Global Secures $5 Million Investment; Native America, FLC Invests in Indigenous Global's Vision for Economic Self-Sufficiency in Indian Country" (the "May 22, 2003 Press Release").  Mitchell Decl., Ex. G.  The press release stated as follows:

> [IGDC], the first and only majority owned and publicly traded Native American Company in the U.S. . . . today announced an investment of $5,000,000 from Native America FLC.  This latest injection of capital will enable Indigenous Global to maintain its pace as it moves toward completion of its energy, pharmaceutical and investment development goals with native tribes in the U.S. and Canada.  "This investment in Indigenous Global's vision to provide strategy, financial and investment tools to help Native American tribes reach economic self-sufficiency is a real coup for our company," said Deni Leonard, chairman and chief executive officer of Indigenous Global Development Corporation.  "We are pleased that Native America's president could see and share our vision for Indian Country."  Our goal is to provide venture capital into Native American projects in the

> U.S.," said Terry Handran, president of Native America, FLC. "We are pleased to provide capital to help Indigenous Global reach its objectives and be our partner in providing venture capital for exceptional projects in the U.S. Native American Communities."

*Id.* IGDC's Director of Marketing, John Mejia, testified that he prepared the initial draft of this press release, at the request of Leonard. Mitchell Decl., Ex. C (Mejia Depo.) at 37. According to Mejia, Leonard told him to write in the press release that Indigenous Global "had received an investment of $5 million." *Id.* at 39. Mejia further testified that after he drafted the press release, he showed it to Leonard, who made changes to the document. *Id.* Mejia did not recall the specific changes but testified that he "never wrote a press release where there were no changes to it." *Id.*

The May 22, 2003 Press Release was based on a letter of intent dated April 14, 2003, between Native America, FLC and IGDC ("the Native America Letter of Intent"). Mitchell Decl., Ex. B (Leonard Depo.) at 59; *see also*, Mitchell Decl., Ex. E. Under the terms of the letter of intent, Native America, FLC was to loan IGDC up to 10.1 million dollars. Mitchell Decl., Ex. E. However, the letter of intent contained the following term, entitled "Conditions Precedent:"

> This summary of terms is not intended as a legally binding financing commitment by the Lender and any obligation on the part of the Lender is subject to the following conditions:
>
> • Completion of final documentation satisfactory to the Lender;
> • Satisfactory completion of the due diligence by the Lender;
> • Any other items required of Lender.

*Id.* The letter was signed by Deni Leonard for IGDC and Terry Handran for Native America, FLC, on April 14, 2003. *Id.*

In his deposition, Leonard testified that he personally negotiated with Native America, FLC to obtain financing to develop IGDC's energy business. Mitchell Decl., Ex. B (Leonard Decl.) at 56. Leonard testified that IGDC and Native America, FLC never signed any other loan documents creating a "legally binding financing commitment." *Id.* at 59-60. Leonard explained that " we had received a call from Mr. Handran that he was going to provide us with the capital, and . . . he then just sort of disappeared; we never saw him. We tried to get a hold of him." *Id.* at 61. Leonard testified that within a year of signing the Native America Letter of Intent he had concluded that IGDC was unlikely to obtain any financing from Native America, FLC. *Id.* at 63.

4

1  **b.      March 3, 2004 Press Release Relating to Cree Energy Agreement**

2  On March 3, 2004, IGDC issued a press release entitled "Cree Energy, LP Signs Agreement

3  with Indigenous Global Development Corporation " (the "March 3 Press Release").  Mitchell Decl.,

4  Ex. I.  The March 3 Press Release states, in part, as follows:

5  > [IGDC] today announced the signing of an agreement with the Cree
   > Energy, LP to buy and sell Canadian First Nations natural gas in the
6  > United States.  This agreement allows Indigenous Global and Cree
   > Energy, LP to be the first native tribal companies to trade natural gas
7  > commodities across the United States and Canadian borders sovereign
   > indigenous nation to sovereign indigenous nation.  The two company's
8  > [sic] immediate plans include developing and implementing a natural
   > gas commodity supply and transportation strategy for the sale of
9  > Canadian First Nation's natural gas in the United States.

10 > [IGDC] and Cree Energy, LP plan to ship First Nation's natural gas
   > upon signing.  This agreement will provide sufficient natural gas to
11 > fuel IGDC's ten-43 megawatt peaker and 49.5 megawatt baseload
   > plants scheduled to start this year.  The expected revenue from the
12 > initial natural gas sales is approximately $32 million per quarter. . .

13 *Id.*

14 The March 3 Press Release was based upon a letter of intent between IGDC and Cree Nation

15 Natural Gas Limited Partnership ("Cree Energy"), signed March 2, 2004 (the "Cree Energy Letter of

16 Intent").  Mitchell Decl., Ex. H.  In the Cree Energy Letter of Intent, the parties agreed to "pursue a

17 business relationship with regard to the purchase and sale of natural gas."  Mitchell Decl., Ex. H.

18 The letter of intent further provided that the financing for Cree Energy's purchase of natural gas was

19 to come from First Indigenous Depository Company ("FIDC").[3]  *Id.*  Like the Native America Letter

20 of Intent, the letter of intent with Cree Energy contained a provision stating that the agreement was

21 not legally binding.  *Id.*  It was signed for IGDC by Leonard.  *Id.*

22 Leonard testified in his deposition that at the time the Cree Energy Letter of Intent was

23 signed, Cree Energy did not own any natural gas and had never sold any natural gas.  Mitchell Decl.,

24 Ex. B (Leonard Depo.) at 73.  Nor was Leonard aware of any agreements between Cree Energy and

25 any First Nations tribe for the purchase of natural gas.  *Id.* at 82.  When asked where FIDC was

26 _____

27      [3]  According to Leonard, FIDC was a limited liability company and was a "tribal company on
   the Warm Springs Indian Reservation," of which Leonard was chairman for some period of time.
28 Mitchell Decl., Ex. B (Leonard Depo.) at 49-50.

United States District Court
For the Northern District of California

1  going to get the money to fund Cree Energy's purchase of natural gas, Leonard testified that he

2  believed IGDC had an agreement with a company in Denver to obtain funding but that he could not

3  remember the name of the company.  *Id*. at 74-75.  Leonard testified that he did not recall any other

4  agreements to provide financing to FIDC in March 2004.  *Id*. at 76.  Leonard further testified that at

5  the time of the March 3 Press Release, IGDC did not own or operate either a 43-megawatt peaker or

6  a 49.5 megawatt baseload plant.  *Id*. at 82.  Leonard testified that either type of plant would cost

7  approximately $1.2 million per megawatt and would take nine to fourteen months to build.  *Id*. at 83-

8  84.

9               **c.**       **Statements in Form 10K-SB for Year Ending June 30, 2004**

10        In its Form 10K-SB for the year ending June 30, 2004, filed with the SEC on

11  October 14, 2004, IGDC made the following statements in describing its natural gas program:

12              Phase Two of the Company's natural gas program will begin in
               October/November 2004.  In this phase, IGDC plans to increase the

13              purchase and transport of Canadian natural gas into the U.S. nine-fold
               each quarter and is hoping to reach revenues from $36 to $108 million

14              in the first full year of natural gas sales.

15              IGDC's contract with Cree Energy, LLC (signed in March 2004 with
               Lafond Financial) allows the Company to purchase and sell

16              92,700,000 MMBtus (90 billion cubic feet) of natural gas into the
               United States in fiscal year 2004/2005.  The Company can also

17              purchase the natural gas at a significant discount to the U.S. spot
               market, for the next 25 years.  IGDC will sell the natural gas to

18              established purchasers and use it to fuel its power plant program.
               IGDC's proposed program includes 10-43 megawatt peaker and 49.5-

19              megawatt baseload plants scheduled to start this year to support this
               nation's demand for reliable clean power.

20

21  Mitchell Decl., Ex. A (Form 10K-SB for Year Ended June 30, 2004) at 8.  The form was signed by

22  Deni Leonard, who certified that he had reviewed the form and that it did not contain any "untrue

23  statements of a material fact or omit to state a material fact necessary to make the statements made."

24  *Id*. at 64.

25        The statements in the Form 10K-SB were based upon an acquisition and financing agreement

26  between FIDC and Cree Energy Ltd. ("Cree Limited"), signed April 26, 2004 (the "Acquisition and

27  Financing Agreement").  Mitchell Decl., Ex. J.  Cree Limited was formed to be the general partner

28  of Cree Energy.  Mitchell Decl, Ex. B (Leonard Depo.) at 91.  Like the Cree Energy Letter of Intent,

United States District Court
For the Northern District of California

1   the Acquisition and Financing Agreement called for Cree Energy to purchase natural gas in Canada

2   and sell it to FIDC, which would then sell the gas to third parties.  Mitchell Decl., Ex. J, Article 1.

3   The natural gas purchases were to be financed by FIDC.  *Id.*  No specific quantity of natural gas was

4   specified in the agreement.  *Id.*  The term of the agreement was five years and provided that the

5   parties could negotiate a renewal of the agreement for five years following the initial five-year term.

6   *Id.*, Article 6.  The agreement was signed by Leonard on behalf of IGDC.  *Id.*

7           As discussed above, Leonard testified in his deposition that Cree Energy did not own any

8   natural gas in April 2004.  Mitchell Decl., Ex. B at 92.  He also testified that IGDC did not own a

9   10-43 megawatt peaker or a 49.5-megawatt baseload plant and that to build such plants would cost

10  approximately $1.2 million per megawatt and would take nine to fourteen months.  *Id.* at 82-84.

11  Leonard further testified that he could not recall any agreements to provide FIDC with financing for

12  the natural gas purchases in April 2004.  *Id.*  at 93.  Leonard acknowledged in his deposition that the

13  Acquisition and Financing Agreement did not specify the amount of natural gas Cree Energy would

14  sell to FIDC.  *Id.* at 94.

15
16              **d.      November 2004 Press Release Relating to Magellan Group Line of
                          Credit**

17          On November 19, 2004, IGDC issued a press release entitled, "IGDC Obtains $12 million

18  Investment to Market Canadian First Nation's Natural Gas to United States" (the "November 19

19  Press Release").  Mitchell Decl., Ex. B.  The press release stated, in part, as follows:

20              [IGDC] today announced its second phase of its purchase and
                transport of Cree Energy, Ltd., Canadian First Nation's natural gas
21              from Canada to the United States.  IGDC's Phase II purchase will
                include additional sales and transport of Canadian natural gas into the
22              U.S. [IGDC] can purchase a total of 92,700,000 MMBtus (90 billion
                cubic feet) of natural gas per year, at a discount to the U.S. spot
23              market, for the next 25 years under their contract with Cree Energy.
                IGDC will sell the natural gas to established purchasers and use it to
24              fuel its power plant program.  Its current purchase is $3 million of
                natural gas per month.  This will increase to $6 million by the next
25              quarter and increase to $9 million of natural gas per month within 18
                months.
26
                This second phase catalyst included a line of credit up to $12 million
27              provided by a private fund that specializes in Energy Industry.  IGDC
                sees this first opportunity with the private energy fund as being the
28              first of many for the IGDC's Energy Program.

                                                    7

United States District Court
For the Northern District of California

1   Mitchell Decl., Ex. K (November 19 Press Release).

2         John Mejia testified in his deposition that he drafted the November 19 Press Release using

3   information that was provided to him by Leonard.  Mitchell Decl., Ex. C at 54.  Mejia stated that

4   Leonard "most likely" made "substantial changes" to Mejia's draft and that Leonard provided the

5   numbers.  *Id*. at 55.  Leonard testified that although he did not recall whether he had reviewed the

6   press release, he did not have "any reason to believe that [he] did not review it."  Mitchell Decl., Ex.

7   B (Leonard Depo.) at 109.

8         The reference to the $12 million line of credit in the November 19 Press Release is based on

9   an agreement that was signed on November 23, 2004 between Magellan Group Investments, Inc.

10  ("Magellan") and FIDC.  Mitchell Decl., Ex. B (Leonard Depo.) at 106.  Leonard signed the

11  agreement on behalf of FIDC.  *Id*.  Leonard admitted at his deposition, however, that the reference in

12  the press release to the "current purchase" of $3 million of natural gas per month reflected only a

13  "plan" to purchase this amount of natural gas and that in fact, the maximum amount of natural gas

14  IGDC had ever purchased at the time of the press release was a purchase "in the $106,000 to

15  $200,000 range" in a single month.  *Id*. at 110.  Leonard further testified that IGDC never purchased

16  $3 million in natural gas.  *Id*. at 111.

17                    **e.        Statements in Form 10-QSB for Quarter Ending March 31, 2005**

18        On May 27, 2005, IGDC filed with the SEC its report on Form 10-QSB for the quarter

19  ending March 31, 2005.  Mitchell Decl., Ex. D.  In that report, IGDC stated, in part, as follows:

20            IGDC helped its shareholder company FIDC to obtain a line of credit
              up to $12 million from a private fund that specializes in energy
21            projects.  FIDC is the company that received the line of credit.  The
              line of credit to FIDC is designated to purchase and transport
22            Canadian First Nation's natural gas from Canada to the United States.
              This upcoming purchase will begin Phase II of IGDC's natural gas
23            program and is expected to begin in mid-2005.  The natural gas will be
              sold to established purchasers and to fuel IGDC's power plant
24            program.  Under existing agreements, IGDC will receive a 90 percent
              royalty payment from FIDC's natural gas sales revenue that is
25            expected to range from $9 million to $15 million annually.

26  *Id*.  The report was signed by Leonard.  *Id*. at 54-56.  Like the Form 10K-SB discussed above, the

27  form also contained a certification by Leonard that he had reviewed the contents of the report and

28  that it did not contain any material misrepresentations or omissions.  *Id*.

8

United States District Court
For the Northern District of California

The $12 million line of credit referenced in the Form 10-QSB was the line of credit extended by Magellan, discussed above.  However, prior to filing the report, IGDC had received a notice of default from Magellan, which was sent February 16, 2005, and was received by Leonard within a few days of that date.  Mitchell Decl., Ex. N (Notice of Default) & B (Leonard Depo.) at 151-52.  In the Notice of Default, Magellan demanded repayment of all outstanding amounts, including a loan of approximately $250,000 that had been provided to FIDC in December 2004 under the $12 million line of credit.  Mitchell Decl., Ex. O; *see also* Mitchell Decl., Ex. M.  The Notice of Default was followed by a letter to Leonard, dated April 26, 2005, from Magellan's attorneys threatening legal action to collect the balance.  Mitchell Decl., Ex. P.   Leonard acknowledged receiving the letter within a few days of April 26.  Mitchell Decl., Ex. B at 159-60.  On May 17, 2005, Magellan filed a lawsuit against FIDC for breach of contract relating to the line of credit.  Mitchell Decl., Ex. L (Complaint).

> **f.     September 20, 2005 Press Release Relating to Letter of Intent with China Metallurgy**

On September 20, 2005, IGDC issued a press release entitled "IGDC Obtains $100 million Investment for its Energy Programs" (the "September 20 Press Release").  The press release stated, in part, as follows:

> [IGDC] . . . today announced the infusion of an investment package of $100 million by a[n] Asian Investment Energy Group.

Mitchell Decl., Ex. T ("September 20, Press Release").  Mejia testified this press release was reviewed by Leonard, who gave final approval on all press releases, and that Leonard was "specific about the wording he wanted" on it.  Mitchell Decl., Ex. C (Mejia Depo.) at 68-70.  Mejia also testified that the statements in the press release regarding an infusion of funds were based on representations to him by Leonard that "there was an investment."  *Id*. at 70.

According to Leonard, the September 20 Press Release was based on a letter of intent by China Metallurgy to IGDC, dated September 7, 2005 (the "China Metallurgy Letter of Intent").  Mitchell Decl., Ex. R.  The China Metallurgy Letter of Intent stated that that entity "intend[ed] to purchase large volumes of Natural Gas, Oil Residue, and lumber for the use of [its] 156 steel mills

9

and factories, spreading throughout China," and that it was "hoping to sign a long-term relationship" with IGDC.  *Id*.  No specific amount of natural gas is stated in the letter.  *Id*.  The letter itself does not create any specific contractual obligations and the chairman of China Metallurgy, Han-Sheng Lin, testified that he never told Leonard that the letter represented a commitment to provide IGDC with $100 million.  Mitchell Decl., Ex. S (Lin Depo.) at  33.  Leonard acknowledged in his deposition that the China Metallurgy Letter of Intent did not contain any reference to an intent to invest money in IGDC and was not itself a legally binding document.  Mitchell Decl., Ex. B at 171-72.

### 3.    Issuance and Sale of IGDC Stock Shares

Between May 2003 and December 2004, on 104 occasions, IGDC issued a total of 43.5 million shares of common stock at prices ranging from $.01 to $1.00 per share, with a total value of $6.2 million.  *See* Mitchell Decl., Ex. D (Form 10Q-SB for period ending March 31, 2005) at 15-31; Ex. V (Summary of Stock Sales).  Of these stock shares, approximately 27 million shares were issued in connection with the settlement of a lawsuit or as collateral for a loan, at a value of approximately $2.2 million.  The remaining shares were either: 1) sold directly to the public (11.5 million shares, for proceeds of $2.4 million) or 2) given in exchange for services rendered, including stock issued in lieu of salaries to IGDC employees (5 million shares, for proceeds of $1.6 million).  Mitchell Decl., ¶ 4.

Leonard testified in the SEC administrative proceeding that several individuals at IGDC had been involved in the sale of IGDC stock, including Leonard himself, Gary Hodges, John Mejia, Larry Gizner and Michelle Wheland, as well as another individual whose name Leonard could not recall.  Mitchell Decl., Ex. F at 537.  Leonard testified that he usually tried to talk to potential investors as a "project manager," discussing the "major issues of the company."  *Id*. at 542-543.  According to Leonard, if individuals wanted to talk specifically about the mechanics of investing in IGDC stock, he had the individual talk to an IGDC staff person.  *Id*.  Nevertheless, Leonard testified that he sold stock to a Denver-based company, Challenger Investment Group, and to a Japanese company.  *Id*. at 537.  He also identified at least 10 people who invested in IGDC with whom he discussed IGDC's projects, including China Metallurgy representative, Eddie Tsang.  *Id*. at 542-557.

United States District Court

For the Northern District of California

1    Tsang himself testified that he purchased $180,000 of IGDC stock after Leonard gave him brochures

2    about IGDC referencing a contract to purchase and sell 90 billion cubic feet of natural gas.  Mitchell

3    Decl., Ex. U (Tsang Depo.) at 33-39.  According to Tsang, Leonard told him that the price of IGDC

4    stock would increase from about $.18 per share to $2.00 to $3.00 per share as a result of a contract to

5    purchase natural gas.  *Id*. at 33.

6          Leonard also sold 1.6 million shares of IGDC stock, on 52 occasions, for his own benefit.

7    Declaration of Ron Nicklas Certifying Records of Regularly Conducted Business Activity ("Nicklas

8    Decl."); Mitchell Decl., ¶ 5 & Ex. X (summary of brokerage records for accounts that Deni Leonard

9    held in his own name and in that of United Native Depository Company, of which Leonard was sole

10   shareholder).  Total proceeds for these stock sales were $249,793.68.  Mitchell Decl. ¶ 5.

11         The last report that IGDC filed with the SEC was for the quarter ending March 31, 2005.

12   Mitchell Decl., Ex. Y.  In light of its failure to file an annual report for the period ending in June

13   2005 or any subsequent quarterly reports, the SEC initiated proceedings to consider whether IGDC's

14   stock should be deregistered.  *Id*.  Among the defenses offered by IGDC was the assertion that SEC

15   staff had engaged in unlawful discrimination against Native Americans.  *Id*., Ex. Z at 4.  On

16   January 12, 2007, the SEC issued a decision deregistering IGDC's stock.  *Id*.  In the decision, the

17   Administrative Law Judge ("ALJ") noted that he had told IGDC at a prehearing conference that if it

18   intended to pursue a defense of prosecutorial bias or selective prosecution, it would need to provide

19   a sworn affidavit describing the basis for the assertion of discrimination with particularity.  *Id*.

20   IGDC did not, however, provide such an affidavit or plead any specific facts on this subject and

21   therefore, the ALJ rejected this defense.  *Id*.  The ALJ's decision became final on February 13, 2007.

22   *Id*., Ex. AA.

23         According to Leonard, his employment with IGDC terminated in the fall of 2006.  Mitchell

24   Decl., Ex. B (Leonard Depo.) at 173.  He remains chairman of FIDC.  *Id*. at 181.  He also serves as

25   chairman of a company called Indigenous Global Energy Corporation ("IGEC"), which he jointly

26   owns with his niece.  *Id*. at 178-80.  IGEC was formed around the time Leonard's employment with

27   IGDC terminated and is engaged in the development of "orphan" wells, that is, wells that have been

28   abandoned.  *Id*. at 177.  According to Leonard, IGEC will open one well at a time, at a cost of about

United States District Court

For the Northern District of California

$150,000 per well. *Id*. Finally, Leonard has plans to open a "World Trade University" and is seeking to purchase a building in Marin County as a facility, at a cost of between 1 and 10 million dollars. *Id*. at 176-77.

**B.    Procedural History**

The SEC initiated this action on September 13, 2006. In the complaint, it asserted the following claims: 1) violations of Section 17 (a) of the Securities Act (IGDC and Leonard); 2) violations of Section 10 (b) of the Exchange Act and Rule 10b-5 (IGDC and Leonard); 3) violations of Sections 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 (IGDC only); 4) aiding and abetting violations of Sections 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13 (Leonard only); and 5) Violations of Rule 13a-14 under the Exchange Act (Leonard only). After IGDC failed to retain counsel, default was entered against it on January 11, 2007. The SEC now seeks summary judgment against Leonard and IGDC. In the alternative, it seeks entry of summary judgment as to Leonard and default judgment as to IGDC.

In the Motion, the SEC asserts that the undisputed evidence establishes that it is entitled to prevail on its claims and in particular, that: 1) IGDC and Leonard violated the antifraud provisions of the securities laws in connection with the offer, purchase and sale of IGDC securities; 2) IGDC violated, and Leonard aided and abetted violations by IGDC, of the periodic reporting provisions of the securities laws; and 3) Leonard violated the certification provisions of the securities laws by falsely certifying the accuracy of IGDC's periodic reports filed with the SEC. The SEC seeks the following remedies: 1) that Leonard be enjoined from further violation of the securities laws; 2) that Leonard be required to disgorge the benefits he obtained as a result of his wrongful conduct, along with prejudgment interest; 3) that Leonard and IGDC be required to pay a civil monetary penalty for the violations; 4) that Leonard be barred from serving as an officer or director of any publicly-traded company; and 5) that Leonard be prohibited from participating in the offering of any penny stock.

Leonard filed an opposition in which he asserted numerous defenses, including the following: 1) IGDC staff were inexperienced and though there may have been "timing mistakes," there was no intent to mislead the public; 2) SEC attorneys acted improperly, including making racial statements against Leonard, using disgruntled IGDC employees as witnesses and making

United States District Court

For the Northern District of California

slanderous statements about Leonard to the San Francisco Chronicle; 3) the SEC has a history of violating the rights of American Indian Tribes; 4) IGDC staff members who had access to Leonard's personal stamp approved stock transfers and sales without Leonard's approval; 5) the IGDC stock sold by Leonard was from his reservation-based company (FIDC) and the SEC has no jurisdiction on the reservation;  6) Leonard and IGDC believed the various pledges to sell natural gas to it were legitimate commitments; 7) the lines of credit were "substantiated and the default was communicated to IGDC as a process and we should continue to seek natural gas by the lender associates located in San Francisco;" 8) the proceeds from Leonard's sale of stock were used to support the companies in Oregon and California; 9) "[t]he individuals who conspired with the SEC attorneys sold their stock to enrich themselves and they also drafted the press releases.  The SEC refused to investigate these individuals;" 10) "IGDC believed that as a Tribal Company, it would have an agreement with the First Nations in Canada based on agreements signed by the Chiefs through Band Council Resolution;" 11) during discovery, the SEC Commissioners refused to answer Leonard's questions and violated Leonard's right to a fair trial; 12) "IGDC was told by the company auditors that the information was factual and did represent the current status of the financials;" and 13) "[t]here is a jurisdictional question regarding the SEC and a Tribal company."  Leonard attached numerous documents to his opposition brief, although these documents were not specifically cited in the brief.

The SEC argues that Leonard has failed to establish a material issue of fact as to any viable defense, arguing in particular that: 1) Leonard cannot show good faith reliance on professionals; 2) Leonard cannot avoid disgorgement of profits based on the unsupported claim that he used the proceeds of his IGDC stock sales to pay business expenses; and 3) whether the court has jurisdiction over FIDC and UNDC is irrelevant to Leonard's liability for securities laws violations.  The SEC also objects to various factual assertions contained in Leonard's Opposition, which the SEC argues are unsupported by any admissible evidence.  Finally, the SEC argues that most of Leonard's declarations are inadmissible and therefore should be stricken.

**United States District Court**
For the Northern District of California

1    III.    **ANALYSIS**

2         A.    **Legal Standard**

3              1.    **Summary Judgment Standard**

4         Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

5    and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

6    any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

7    P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a

8    genuine issue of material fact with respect to an essential element of the non-moving party's claim,

9    or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex*

10   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the

11   movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

12   genuine issue of material fact," that is, "that, on all the essential elements of its case on which it

13   bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

14   *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this

15   showing, the burden then shifts to the party opposing summary judgment to designate "specific facts

16   showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all

17   reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S.

18   242, 255 (1986).

19              2.    **Default Judgment Standard**

20        Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, the court may enter a

21   default judgment where the clerk, under Rule 55(a), has previously entered the party's default based

22   upon failure to plead or otherwise defend the action. Fed. R. Civ. P. 55(b). A defendant's default,

23   however, does not automatically entitle the plaintiff to a court-ordered default judgment. *Draper v.*

24   *Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986). The district court has discretion in its decision to

25   grant or deny relief upon an application for default judgment. *Aldabe v. Aldabe*, 616 F.2d 1089,

26   1092 (9th Cir. 1980); *Lau Ah Yew v. Dulles*, 236 F.2d 415, 416 (9th Cir. 1956) (affirming district

27   court's denial of default judgment). The court may consider the following factors in deciding

28   whether to enter a default judgment:

United States District Court
For the Northern District of California

> (1) the possibility of prejudice to the plaintiff, (2) the merits of
> plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)
> the sum of money at stake in the action; (5) the possibility of a dispute
> concerning material facts; (6) whether the default was due to
> excusable neglect, and (7) the strong policy underlying the Federal
> Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

In considering the sufficiency of the complaint and the merits of the plaintiff's substantive claims, facts alleged in the complaint not relating to damages are deemed to be true upon default. *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); Fed. R. Civ. P. 8(d). On the other hand, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). As a result, where the allegations in a complaint are not "well-pleaded," liability is not established by virtue of the defendant's default and default judgment should not be entered. *Id.*

**B.      The SEC's Objections to Evidence and Factual Assertions**

As a preliminary matter, the Court sustains the SEC's objections regarding: 1) factual assertions that are unsupported by evidence in Leonard's Opposition; and 2) the exhibits that Leonard submitted in support of his opposition. Leonard's brief contains countless assertions of fact that are unsupported by any admissible evidence. In addition, his exhibits are unauthenticated and none of them is cited in Leonard's brief. Accordingly, the Court strikes the statements and exhibits to which the SEC objects.[4]

**C.      Summary Judgment As to Leonard**

**1.      Securities Fraud Claims Under Section 17(a) of the Securities Act of 1993 and Section 10(b) of the Exchange Act of 1934 and Rule 10b-5**

The SEC asserts that it is entitled to summary judgment that Leonard violated Section 17(a) of the Securities Act of 1933 ("the Securities Act")[5] and Section 10(b) of the Exchange Act of 1934

---

[4]The Court notes, however, that even if all of the inadmissible evidence is considered, the Court reaches the same result.

[5]  Section 17(a) provides, in part, as follows:

(a)  It shall be unlawful for any person in the offer or sale of any securities . . .

15

United States District Court

For the Northern District of California

1    (the "Exchange Act"), as well as Rule 10b-5 thereunder.[6]   The Court agrees.

2         Both Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, as well as

3    Rule 10b-5, "forbid making a material misstatement or omission in connection with the offer or sale

4    of a security by means of interstate commerce."  *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852,856 (9th

5    Cir. 2001).  Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require scienter.  *Aaron v.*

6    *SEC*, 446 U.S. 680, 701-02 (1980).  The scienter requirement may be satisfied by showing

7    recklessness.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 (9th Cir. 1990).  "Reckless

8    conduct is conduct that consists of a highly unreasonable act, or omission, that is an extreme

9    departure from the standards of ordinary care, and which presents a danger of misleading buyers or

10   sellers that is either known to the defendant or is so obvious that the actor must have been aware of

11   it."  *SEC v. Dain Rauscher*, 254 F.3d at 856 (citations omitted).  Violations of Section 17(a)(2) and

12   (3) require a showing of negligence.  *Id.*  Information is material if there is a "substantial likelihood"

13   the disclosure of the misstatement or omitted fact "would have been viewed by the reasonable

14

15              (1) to employ any device, scheme, or artifice to defraud, or

16              (2) to obtain money or property by means of any untrue statement of a material fact or
                any omission to state a material fact necessary in order to make the statements made, in
17              light of the circumstances under which they were made, not misleading; or

18              (3) to engage in any transaction, practice, or course of business which operates or would
19              operate as a fraud or deceit upon the purchaser.

20   15 U.S.C. § 77q(a).

21

22   [6]  Rule 10b-5 provides, in part, as follows:

23              It shall be unlawful for any person, directly or indirectly, by the use of any means or
                instrumentality of interstate commerce, or of the mails or of any facility of any national
24              securities exchange,

25   . . .

26              (b) To make any untrue statement of a material fact or to omit to state a material fact
                necessary in order to make the statements made, in the light of the circumstances under
27              which they were made, not misleading . . .

28   17 C.F.R. § 240.10b-5.

                                                    16

1   investor as having significantly altered the total mix of information made available." *Basic, Inc. v.*

2   *Levinson*, 485 U.S. 224, 231-32 (1988).

3          Here, the undisputed evidence establishes that Leonard and IGDC  made a series of

4   statements, in press releases and SEC filings, about various natural gas purchases and financing

5   deals.   Because they were made in press releases and SEC filings, they satisfy the requirement that

6   the statements must be made in connection with the purchase and sale of securities.  *See SEC v.*

7   *Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).  The statements were also false and

8   misleading.

9         First, the May 22, 2003 Press Release states that IGDC had "secured" a $5 million

10   investment from Native America, FLC, and refers to "[t]his latest injection of capital," even though

11   IGDC had received no cash and had not entered into a legally binding agreement with Native

12   America, FLC (and never would).  These statements were false.

13         Second, the March 3, 2004 Press Release represented that IGDC had entered into an

14   agreement with Cree Energy under which Cree Energy planned to ship natural gas to IGDC "upon

15   signing," that sale of this natural gas would result in approximately $32 million in revenues per

16   quarter, and that the agreement would provide sufficient natural gas to fuel IGDC's 43 megawatt

17   peaker and 49.5 megawatt baseload electric generating plants.  Yet IGDC had no binding agreement

18   with Cree Energy, only a letter of intent.  Moreover, Cree Energy had no agreements to purchase gas

19   and FIDC – which was to fund the purchase of gas by Cree Energy – had no source of financing for

20   the purchase.  Under these circumstances, the statement that Cree Energy planned to ship the natural

21   gas "upon signing" was baseless, as was the statement that expected revenues from the gas sales

22   would be $32 million per quarter.  Finally, IGDC did not have any electric generating plants and did

23   not have any financing to build or buy any such plants.

24         Third, IGDC's Form 10K-SB for the period ended June 30, 2004, stated that the Acquisition

25   and Financing Agreement with Cree Limited would allow it to enter Phase II of its natural gas sales

26   program, in which it planned to increase the purchase and sale of Canadian natural gas nine-fold

27   each quarter and hoped to reach revenues of $36 million to $108 million in the first full year.  The

28   report also stated that  IGDC had a contract with Cree that allowed IGDC to purchase and sell 90

1   million cubic feet of natural gas "at a significant discount to the U.S. spot market, for the next 25

2   years."  This statement was false and misleading.  Nothing in the Acquisition and Financing

3   Agreement required Cree to sell IGDC 90 million cubic feet of natural gas; nor did it specify that it

4   would be sold at "a significant discount to the U.S. spot market."  In addition, the term of the

5   agreement was not 25 years but rather, five years, with a possibility of renewal for another five

6   years.  And, as discussed above, Cree did not own any natural gas or have the financing (which was

7   to come from FIDC) to purchase natural gas.

8        Fourth, statements made in the November 19, 2004 Press Release were false and misleading.

9   That press release repeated the statement discussed above – that the Acquisition and Financing

10  Agreement would allow IGDC to purchase from Cree Energy 90 million cubic feet of natural gas, at

11  a significant discount to the U.S. spot market, for a period of 25 years.  For the reasons stated above,

12  this statement was false.  In addition, the press release stated that IGDC's current purchases of

13  natural gas were $3 million per month.  However, IGDC had never purchased $3 million in natural

14  gas in any month, and never would.  Nor was there any factual basis for the statement that monthly

15  purchases would increase to $6 million by the next quarter and $ 9 million within 18 months.

16       Fifth, IGDC and Leonard made false statements in IGDC's Form 10–QSB for the quarter

17  ended March 31, 2005, describing the Magellan line of credit as a source of financing for its natural

18  gas program, even though IGDC had already received a notice of default from Magellan and in fact,

19  Magellan had initiated legal proceedings against IGDC.  Despite this fact, IGDC stated that the $12

20  million line of credit from Magellan would help begin Phase II of IGDC's natural gas program,

21  expected to start mid-2005.  The report further stated that the gas purchased in Phase II would be

22  sold to established purchasers, whose royalty payments on the sales revenue was projected to range

23  from $9 million to $15 million annually.  Yet IGDC had no source of funding to pay for this natural

24  gas except the Magellan line of credit.

25       Sixth, in the September 20, 2005 Press Release, IGDC and Leonard falsely stated that IGDC

26  had obtained an investment package of $100 million from an Asian investment group.  However, the

27  letter of intent on which the statement was based, issued by China Metallurgy, contained no amount

28  and no legally binding commitment to provide IGDC with any financing.

18

United States District Court

For the Northern District of California

1    Further, all of the statements listed above were material because they involved significant

2    financing and purchasing agreements, each at a point in time when IGDC had no other significant

3    source of financing and no other agreements for the purchase and sale of natural gas.  In each case,

4    the statements indicated that the deals would lead to substantial increases in revenues.  Under these

5    circumstances, the false statements would have significantly altered the total mix of information

6    available to reasonable investors.  *Basic, Inc.*, 485 U.S. at 231-32.

7    Finally, the Court concludes that the SEC has established the Leonard acted with scienter as

8    to each of the statements discussed above, both because the undisputed evidence establishes that the

9    statements are attributable to Leonard and because the statements were reckless in light of the

10   circumstances in which they were made.

11   First, with respect to the four press releases, IGDC's Director of Marketing, John Mejia,

12   offered specific testimony that he drafted the press releases at Leonard's instruction, using

13   information that Leonard provided to him and further, that Leonard was involved in editing the press

14   releases and reviewed and approved each one before it was issued.  Leonard offers no specific or

15   admissible evidence to the contrary.  Nor does the general assertion in Leonard's Opposition that the

16   press releases were drafted by "individuals who conspired with the SEC" help Leonard as it is

17   undisputed that, whoever drafted the press releases, Leonard always reviewed and approved press

18   releases before release.  Similarly, Leonard signed a certification for each of the SEC filings in

19   which false statements were made, attesting that the reports contained no misrepresentations of fact.

20   Second, with respect to each misstatement, Leonard's conduct was highly unreasonable

21   given what Leonard knew about the surrounding circumstances.  The undisputed evidence shows

22   that Leonard himself negotiated the various agreements referenced in the false statements discussed

23   above.  In each case, it would have been entirely obvious to a reasonable person that the claims

24   made in the statements did not accurately reflect the true facts but rather, were baseless.  Therefore,

25   the Court concludes that Leonard's conduct in connection with the statements was reckless.

26   The Court rejects Leonard's defense that he made these statements in good faith, even if they

27   turned out to be untrue.  Whatever Leonard's subjective belief, his conduct was, nonetheless,

28   reckless because he "had reasonable grounds to believe material facts existed that were misstated or

19

omitted, but nonetheless failed to . . . disclose those facts although [he] could have done so without

extraordinary effort.  *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

The Court also rejects Leonard's defense that he is not liable because he relied on the advice

of outside counsel and/or auditors.  In order to establish such a defense, a defendant must show that

he: 1) made full disclosure of the relevant facts to the professional; 2) requested advice from the

professional as to the legality of the proposed action; 3) received advice that it was legal; and

4) relied in good faith on that advice.  *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459,

467 (9th Cir. 1985).  Leonard has offered no specific or admissible evidence that he made full

disclosure of the relevant facts to his attorneys or auditors as to *any* of the statements discussed

above, even assuming the other programs of the test are met.  Therefore, this defense fails.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

**2.      Periodic Reporting Claim Under Section 13(a) of the Exchange Act, Rule 13a-1 and Rule 13a-13**

Section 13(a) of the Exchange Act,[7] Rule 13a-1,[8] and Rule 13a-13[9] require issuers of

---

[7] Section 13(a) provides, in relevant part, as follows:

a) Reports by issuer of security; contents

Every issuer of a security registered pursuant to section 78l of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security–
. . .

(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

15 U.S.C. § 78m(a).

[8] Rule 13a-1 provides as follows:

Every issuer having securities registered pursuant to section 12 of the Act (15 U.S.C. 78l) shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

17 C.F.R. § 240.13a-1.

[9] Rule 13a-13 provides, in part, as follows:

a) Except as provided in paragraphs (b) and (c) of this section, every issuer that has securities registered pursuant to section 12 of the Act and is required to file annual reports pursuant to section 13 of the Act, and has filed or intends to file such reports on Form 10-K (§ 249.310 of this chapter), shall file a quarterly report on Form 10-Q (§ 249.308a of this chapter) within the period specified in General Instruction A.1. to that form for each of the first three quarters of each fiscal year of the issuer, commencing with the first fiscal quarter following the most recent fiscal year for which full financial statements were included in the registration statement, or, if the registration statement included financial statements for an interim period subsequent to the most recent fiscal year end meeting the requirements of Article 10 of Regulation S-X and Rule 8-03 of Regulation S-X for smaller reporting companies, for the first fiscal quarter subsequent to the quarter reported upon in the registration statement. The first quarterly report of the issuer shall be filed either within 45 days after the effective date of the registration statement or on or before the date on which such report would have been required to be filed if the issuer has been required to file reports on Form 10-Q as of its last fiscal quarter, whichever is later.

United States District Court

For the Northern District of California

securities registered under Section 12 of the Exchange Act to file with the Commission annual and quarterly reports.  Courts have held that implicit in the reporting requirements of the Exchange Act is a duty to report truthfully and completely.  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978).  Further, where a violation is asserted by the SEC (rather than a private plaintiff), no finding of scienter is required.  To establish aiding and abetting liability, the following four requirements must be shown: "(1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) substantial assistance in the commission of the primary violation."  *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996).  The Court concludes, based on the undisputed evidence, that all of the elements of the aiding and abetting claim against Leonard have been met.

First, for the reasons discussed above, there has been a primary violation.  In particular, IGDC's June 30, 2004 Form 10K-SB and its March 31, 2005 Form 10Q-SB contained materially false statements.  Second, Leonard knew that the particular statements were false because he himself negotiated the agreements (or tentative agreements) on which the statements were based.  Third, Leonard substantially assisted in the violations by signing the certifications stating that the reports did not contain any material misstatements or omissions.  Therefore, the SEC is entitled to summary judgment against Leonard with respect to the reporting claims.

**3.     Claim Under Exchange Act Rule 13a-14 Based on False Certification**

Exchange Act Rule 13a-14 provides that annual reports filed with the SEC under Section 13(a) of the Exchange Act must include certifications signed by the principal executive and principal financial officers of the issuer.  Among these is a certification that the report, to the best of the officer's knowledge, includes no material misstatements and omits no material information.  For the reasons stated above, the Court concludes that Leonard violated this requirement by signing these certifications even though the reports contained material misstatements of which Leonard was aware.  Therefore, the SEC is entitled to summary judgment on this claim.

---

17 C.F.R. § 240.13a-13.

### 4.  Alleged Misconduct by SEC

Leonard asserts with respect to all of his claims that the SEC acted improperly, including discriminating against Leonard and IGDC on the basis of race.  The Court construes these allegations as an assertion of an unclean hands defense.  The Court finds Leonard's unclean hands defense to be unpersuasive.

Although generally, an unclean hands defense cannot be asserted against a government entity, courts have held that there may be an exception to this rule where "'the agency's misconduct [is] egregious and the resulting prejudice to the defendant rise[s] to a constitutional level." *SEC .v Follick*, 2002 WL 31833868 *8 (S.D.N.Y.) (citations omitted); *see also SEC v. Sands,* 902 F.Supp. 1149, 1166 (C.D. Cal. 1995) (holding that the defense of unclean hands can be asserted against the government when the government's conduct is so outrageous as to cause constitutional injury). "[C]ourts have permitted the defense only where the alleged misconduct occurred during the investigation leading to the suit and the misconduct prejudiced the defendant in his defense of the action." *SEC v. Elecs., Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988) (citations omitted).

Here, Leonard's allegations have been vague and conclusory.  He has provided no specific facts or evidence to support his allegations and he has pointed to no conduct on the part of the government that has resulted in any actual prejudice with respect to Leonard's (or IGDC's) defense in this action.  Therefore, the Court concludes that Leonard's unclean hands defense fails as a matter of law.

### 5.  Jurisdiction Over Tribal Companies

Leonard argues in his Opposition that there is a "jurisdictional question" relating to the SEC's claims because FIDC, which was directly involved in many of the deals and agreements at issue, is a tribal company located on the Warm Springs Indian Reservation.  Leonard has pointed to no authority, however, for the proposition that a company whose shares are publicly traded is immune from the securities laws because it did some of its business through a tribal-owned company.  Nor has the Court found any such authority.  The Court rejects this defense.

For the reasons stated above, the SEC is entitled to summary judgment with respect to all of its claims against Leonard.

United States District Court

For the Northern District of California

**D.      Default Judgment as to IGDC**

Although the SEC has requested summary judgment as to both Leonard and IGDC, the Court finds no authority that suggests it may enter summary judgment against a defendant against whom default has already been entered.  Rather, the appropriate procedural device under these circumstances is entry of default judgment as to the entity that has defaulted.  Having reviewed the claims against IGDC on the merits and found that the SEC is entitled to summary judgment, the Court concludes, for the reasons discussed above, that the SEC is entitled to entry of default judgment as to IGDC.

**E.      Remedy**

The SEC seeks the following relief with respect to the IGDC and Leonard: 1) that Leonard be enjoined from further violation of the securities laws; 2) that Leonard be required to disgorge the benefits he obtained as a result of his wrongful conduct, along with prejudgment interest; 3) that Leonard and IGDC be required to pay a civil monetary penalty for the violations; 4) that Leonard be barred from serving as an officer or director of any publicly-traded company; and 5) that Leonard be prohibited from participating in the offering of any penny stock.  The Court addresses each form of relief below.

**1.      Injunction Against Leonard Prohibiting Violation of Securities Laws**

Both the Securities and Exchange Acts give the Court discretion to enjoin practices that violate those acts where there is a reasonable likelihood of future violations.  15 U.S.C. § 77t(b) & 78(u)d; *see also SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).  In determining whether there is a likelihood of future violations, courts consider the following factors:

> 1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

*SEC v. Fehn*, 97 F.3d at 1295.  Here, every one of these factors point in the direction of entering injunctive relief against Leonard prohibiting future violation of the securities laws.  First, his conduct reflects a high degree of scienter.  Second, he engaged in a pattern of conduct that violated the securities laws, repeatedly making statements that grossly exaggerated the financial strength and

24

United States District Court

For the Northern District of California

1   likely future revenue of IGDC and, in many cases, were outright false.  Third, Leonard has not

2   acknowledged that he engaged in wrongful conduct.  Fourth, Leonard is continuing to create

3   companies and to seek financing for various ventures, which raises the possibility of future

4   violations.  Fifth, Leonard has not offered any assurances that he will not engage in future violations

5   and even if he were to do so, such assurances would not be credible in light of his past conduct and

6   continued failure to acknowledge that he acted wrongfully.

7        Accordingly, SEC is entitled to an injunction prohibiting Leonard from violating the

8   securities laws in the future.

9                **2.     Disgorgement of Profits**

10       Another remedy available in SEC actions involving securities violations is disgorgement of

11   profits.  *See SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993).  In *SEC v. Rind*, the court

12   emphasized the significance of this remedy:

> Disgorgement plays a central role in the enforcement of the securities
> laws. The effective enforcement of the federal securities laws requires
> that the [Commission] be able to make violations unprofitable. The
> deterrent effect of [a Commission] enforcement action would be
> greatly undermined if securities law violators were not required to
> disgorge illicit profits.". . . By deterring violations of the securities
> laws, disgorgement actions further the Commission's public policy
> mission of protecting investors and safeguarding the integrity of the
> markets.

18   *Id.* (citations omitted).  The Court has broad discretion, not only as to whether disgorgement is

19   appropriate but also the amount of disgorgement.  *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450,

20   1474-75 (2d Cir. 1996).  Further, the amount may include prejudgment interest to ensure that the

21   wrong-doer does not profit from his wrongful conduct.  *SEC v. Cross Fin. Servs., Inc.*, 908 F. Supp.

22   718, 734 (C.D. Cal. 1995).

23       Here, the SEC asks the Court to order that Leonard disgorge profits in the amount of

24   $249,793.68 – Leonard's total proceeds from the sale of IGDC stock – along with $37,586.84 in

25   prejudgment interest.[10]  The Court finds that this amount is appropriate under the circumstances and

26

27       [10]  The SEC has calculated prejudgment interest under 28 U.S.C. § 1961, which specifies that
prejudgment interest shall be calculated using the 1-year constant maturity Treasury yield rate in effect

28   at the time of judgment.  Courts have held that in the case of prejudgment interest on defendant stock

United States District Court

For the Northern District of California

1   will serve to deter wrongful conduct of the sort engaged in by Leonard.  The Court also rejects

2   Leonard's assertion that disgorgement should be denied because he used the proceeds of his IGDC

3   stock sales for business expenses.  *See SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1114-15

4   (9th Cir. 2006) (holding that disgorgement was proper even if proceeds were used for business

5   expenses because the funds benefitted the wrongdoer by defraying the wrongdoer's expenses).

6                            **3.      Civil Monetary Penalty**

7          The SEC also asks that the Court impose civil monetary penalties on Leonard and IGDC

8   pursuant to Section 20 of the Securities Act and Section 21 of the Exchange Act.  *See* 15 U.S.C.

9   §§ 77t(d)(2), 78u(d)(3).  The Court concludes that the imposition of monetary penalties as to both

10  Leonard and IGDC is appropriate.

11         The purpose of imposing monetary penalties in addition to disgorgement of profits is to

12  punish the violator as well as deter future violations of the securities laws.  *SEC v. Moran*, 944 F.

13  Supp. 286, 296 (S.D.N.Y. 1996).  Congress has established a three-tiered system to guide courts in

14  determining the appropriate amount of civil monetary penalties.  *See* 15 U.S.C. §§ 77t(d)(2),

15  78u(d)(3); 17 C.F.R. § 201.1002.  In particular, a "first-tier" penalty of up to $6,500.00 for an

16  individual and $60,000.00 for an entity may be imposed for each violation of the securities laws; a

17  "second-tier" penalty of up to $60,000.00 for an individual and $300,000 for an entity – or the gross

18  amount of the defendant's pecuniary gain –  may be imposed for violations of the securities laws

19  that involve fraud or deceit; and a "third-tier" penalty of up to $120,000.00 for an individual and

20  $600,000.00 for an entity  – or the gross amount of the defendant's pecuniary gain – may be

21  imposed for violations of the securities laws that involved fraud or deceit *and* resulted in substantial

22  loss or a significant risk of substantial loss.  *See id.*  Within this framework, the amount of the

23  penalty is left to the discretion of the court, to be determined "in light of the facts and

24  circumstances" of the case. 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(i).

25

26  _____

27  sales, the rate in effect at the time of the last stock sale should be used.  *SEC v. M & A West, Inc.*, 2005 U.S. Dist. Lexis 30297 (N.D. Cal.). The date of the last documented stock sale was September 19, 2005.

28  Mitchell Decl., Ex. X.  At that time, the 1-year constant maturity Treasury yield was 3.78%.  At this rate, prejudgment interest to May 30, 2008 is $37,586.84.

United States District Court

For the Northern District of California

Here, the Court finds that it is appropriate to impose third-tier penalties as to both Leonard and IGDC because, as discussed above, the violations involved fraud and deceit *and* either resulted in or risked substantial loss on the part of investors. As to Leonard, the Court imposes a civil monetary penalty in the amount of $249,793.68. This is the amount by which Leonard profited from his fraudulent conduct. *See SEC v. Carnicle*, 1999 U.S. Dist. LEXIS 23379 (D. Utah 1999) at *13 (imposing monetary penalty equal in amount to the amount to be disgorged). It is also appropriate in light of the fact that Leonard sold IGDC shares for his own benefit on 52 separate occasions, giving rise to a per sale penalty of approximately $4,800.00. *See SEC v. Amerifirst Funding, Inc.*, 2008 WL 1959843 (N.D. Tex.) at *9 (imposing a penalty of $2,000.00 for each of the 489 separate investments the defendants received on the basis that each investment was a separate violation of the securities laws).

As to IGDC, the Court imposes a penalty of $208,000.00. This amount is obtained by multiplying the number of separate stock sales (104) made by IGDC during the relevant period by a per sale penalty of $2,000.00. *See id.*

### 4. Order Prohibiting Leonard from Serving as an Officer of Director of a Publicly-Traded Company

An individual who is found to have violated section 17(a) of the Securities Act or Section 10(b) or Rule 10b-5 of the Exchange Act may be prohibited from acting as an officer or director of a public company, where "the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer." 15 U.S.C. § § 77t(e), 78u(d)(2). The "unfitness" standard was adopted in 2002 under the Sarbanes-Oxley Act, Pub. L.No. 107-204, § 305(a), 116 Stat. 745, lowering the burden from the prior "substantial unfitness standard." In addressing the "substantial unfitness" standard, the Ninth Circuit set forth the following factors to be considered:

> (1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's repeat offender' status; (3) the defendant's role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

*SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998). The Court finds that all of these factors support the conclusion that Leonard meets the "substantially unfit" test – and therefore the

new lower standard – that warrants imposition of an "officer director bar."   Accordingly, Leonard may not serve as an officer or director of any public company.

### 5.   Prohibition on Offering Any Penny Stock

Where a defendant has engaged in wrongdoing while participating in a penny stock offering, a court may issue an order prohibiting that defendant from participating in future penny stock offerings. 15 U.S.C. § 78u(d)(6)(A).  The stock offered by IGDC during the relevant period was penny stock.  The factors considered in determining whether a penny stock prohibition is appropriate are the same as those considered in connection with an officer/director bar. *SEC v. Wolfson*, 2006 U.S. Dist. LEXIS 29543, * 29 (D. Utah).  For the reasons stated above, a prohibition on offering penny stock is appropriate.

## IV.   CONCLUSION

The Motion is GRANTED.  Summary Judgment shall be entered as to Defendant Leonard. Default Judgment shall be entered against IGDC.  Leonard shall be permanently enjoined from any future violations of the securities laws that were found to be violated in this case, that is, Section 17(a) of the Securities Act and Sections 10(b) and 13(a) of the Exchange Act.  In addition, he shall be ordered to disgorge profits in the amount of $249,793.68 plus pre-judgment interest in the amount of $37,586.84.  Leonard shall be barred from acting as an officer or director of any publicly-traded company or from participating in the offering of any penny stock.  Finally, Leonard is ordered to pay $249,793.68 in civil monetary penalties; IGDC shall pay $208,000.00 in civil monetary penalties.

IT IS SO ORDERED.


Dated:  June 30, 2008

_____
JOSEPH C. SPERO
United States Magistrate Judge